IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE STEAK UMM COMPANY, LLC, | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | NO. 09-2857 |
| | : | |
| STEAK 'EM UP, INC., | : | |
| Defendant | : | |

# M E M O R A N D U M

**STENGEL, J.**                                   **August  23, 2011**

This trademark infringement action was filed by The Steak Umm Company, Inc., against Steak 'Em-Up, Inc.  Steak Umm is a national seller of frozen steak and hamburger products. Steak 'Em-Up is a pizza shop and deli in South Philadelphia.  Steak Umm alleges that Steak 'Em-Up has infringed its "Steak Umm" trademark by using the phrase "steak 'em-up" in its store name and advertising.  Steak Umm has filed federal claims under the Lanham Act for infringement, unfair competition, and false designation of origin, as well as federal and state trademark dilution claims.  The parties have filed cross motions for summary judgment.  For the reasons outlined below, Steak Umm's motion will be denied and Steak 'Em-Up's motion will be granted in part and denied in part.

## I.        BACKGROUND

Steak Umm produces frozen sliced steak and hamburger products for sale in grocery stores.  Defendant's Separate Statement of Uncontestable Facts ("Def. S.U.F.") ¶¶ 31, 34.  It alleges that, since opening in October of 2005, Steak 'Em-Up has been infringing its trademarks. Id. at ¶ 59; Plaintiff's Statement of Uncontested Facts ("Pl. S.U.F.") ¶¶ 1,14.  Steak 'Em-Up is a restaurant and grocery store that has takeout and delivery services.  Def. S.U.F. ¶ 55.

Steak Umm has marketed and sold frozen steak products using the "Steak Umm" mark since 1975.  Pl. S.U.F. ¶ 4.  Its mark was registered in 1976.  Id. at ¶ 7.  Steak Umm is currently owned by Sergei Szortyka, who took over Steak Umm in May 2006 when his company, Quaker Maid Meats, Inc., acquired it.  Def. S.U.F. ¶ 25.  Quaker Maid Meats acquired Steak Umm solely for its customer list and intellectual property, and not for any of its actual assets or equipment.  Szortyka Dep. 29:22-25, Sep. 21, 2010.  Steak Umm's products are sold throughout the United States.  Pl. S.U.F. ¶ 10.  Steak Umm advertises in print, on national television, and on the internet through its website.  Id. at ¶ 11.

Steak 'Em-Up was opened in October 2005 by its founder and owner, Michael Lane.  Def. S.U.F. ¶¶ 54, 61.  Lane began planning for the store in 2003.  Id. at ¶ 55.  Around this time, he began brainstorming names for the store.  Id. at ¶ 56.  He eventually settled on "Steak 'Em-Up," a play on the phrase "stick 'em-up."  Id. at ¶¶ 57-58.  Along with the name, Lane developed a logo, an old-time cartoon gangster holding a hoagie[1] as if it were a gun, to accompany the name in advertisements.  Id.  Steak 'Em-Up advertises in a local paper, on local television, through its website, and by distributing menus locally.  Id. at ¶ 74.

Steak Umm became aware of the alleged infringement when its founder, Gene Gagliardi, saw advertisements for Steak 'Em-Up and called Szortyka to ask if they were related to Steak Umm.  Szortyka Dep. 16:19-19:21.  Upon learning of the ad, Szortyka had his lawyer run a

---

[1]  Although the true origin of the term is disputed, the word "hoagie" is used primarily in Philadelphia and Southern New Jersey to describe the sandwich commonly referred to as a "sub" or "submarine sandwich."  According to some, the word "hoagie" was first used in the late 19th or early 20th century among the Italian community in South Philadelphia, when "on the hoke" was a slang term describing a destitute person.  Deli owners would give away scraps of cheeses and meats in an Italian bread-roll known as a "hokie," but the Italian immigrants pronounced it "hoagie."  See "The Submarine Sandwich: Lexical Variations in a Cultural Context," Eames & Robboy, *American Speech*, Vol. 42, No. 4 (Dec., 1967), pp. 279–288.  Others believe the term originated at the Philadelphia shipyard Hog Island, where Italian workers placed various meats and cheeses on rolls during World War I.  Other common terms for the sandwich held by Mr. Lane's gangster include "sub," "grinder," "hero," or simply "Italian sandwich."

Google search for the term "steak um up."  Id. at 22:9-13.  Some of the top hits from this search refer to a "Steak Um Up" store at Steak 'Em-Up's address.[2]  Pl. S.U.F. ¶ 20.

Steak Umm filed its initial complaint on June 25, 2009, seeking both injunctive relief and monetary damages.  During discovery, Steak Umm hired an expert, Robert Klein, who conducted a survey of local consumers.  Steak Umm argues that Mr. Klein's survey supports its contention that there is a likelihood of confusion, as it shows that 12.9% to 24.1% of consumers would believe Steak 'Em-Up sells Steak Umm products.  Id. at ¶¶ 27-28.  In response, Steak 'Em-Up retained its own expert, Michael Rappeport, to critique the survey.  Mr. Rappeport concluded that no more than 10% of consumers are likely to be confused, although he did not conduct a survey of his own.  Id. at ¶¶ 29-31.  Following the close of discovery, Steak Umm filed an amended complaint on May 4, 2011, withdrawing some of its claims against Steak 'Em-Up. Its Lanham Act and state and federal dilution claims remain.  Id. at ¶ 25.


## II.      STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

A party seeking summary judgment initially bears responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S.

---

[2] "Steak Um Up" is, of course, not the name of Defendant's store. Additionally, when a search is made for "steak um up," Google performs an automatic correction and displays results for "Steak 'Em-Up."

317, 322 (1986).  A party asserting that a fact cannot be or is genuinely disputed must support

the assertion by citing relevant portions of the record, including depositions, documents,

affidavits, or declarations, or showing that the materials cited do not establish the absence or

presence of a genuine dispute, or showing that an adverse party cannot produce admissible

evidence to support the fact.  FED. R. CIV. P. 56(c).  Summary judgment is therefore appropriate

when the non-moving party fails to rebut the moving party's argument that there is no genuine

issue of fact by pointing to evidence that is "sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial."

Celotex, 477 U.S. at 322.

Under Rule 56, the court must view the evidence presented in the motion in the light

most favorable to the opposing party.  Anderson, 477 U.S. at 255.  The court must decide not

whether the evidence unmistakably favors one side or the other, but whether a fair-minded jury

could return a verdict for the plaintiff on the evidence presented.  Id. at 252.  If the non-moving

party has exceeded the mere scintilla of evidence threshold and has offered a genuine issue of

material fact, then the court cannot credit the movant's version of events against the opponent,

even if the quantity of the movant's evidence far outweighs that of its opponent.  Big Apple

BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).  "The

summary judgment standard is not affected when the parties file cross-motions for summary

judgment."  Diebold, Inc. v. Continental Cas. Co., 719 F.Supp.2d 451, 461 (D.N.J. 2010).  Such

motions "are no more than a claim by each side that it alone is entitled to summary judgment,

and the making of such inherently contradictory claims does not constitute an agreement that if

one is rejected the other is necessarily justified or that the losing party waives judicial

consideration and determination whether genuine issues of material fact exist."  Id. (citing

Transportes Ferreos de Venez. II CA v. NKK Corp., 239 F.3d 555, 560 (3d Cir. 2001) (internal

quotations omitted)).  If review of the record reveals no genuine issue of material fact, it is

appropriate to enter judgment in favor of the deserving party.  Id. (citing Iberia Foods Corp. v.

Romeo, 150 F.3d 298, 302 (3d Cir. 1998)).


III.    DISCUSSION

        The Third Circuit has called summary judgment in trademark cases "the exception."

Country Floors, Inc. v. P'ship of Gepner and Ford, 930 F.2d 1056, 1062-63 (3d Cir. 1991).

Other Circuits agree.  See AHP Subsidiary Holding Co. v. Stuart Hale Co., 1 F.3d 611, 616 (7th

Cir. 1993) ("[A] motion for summary judgment in trademark infringement cases must be

approached with great caution."); Clicks Billards, Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1265

(9th Cir. 2001) (observing that summary judgment on the likelihood of confusion issue is

disfavored and is "routinely submitted for jury determination as a question of fact"); Interstellar

Starship Services, Ltd. v. Epix Inc., 184 F.3d 1107, 1109 (9th Cir. 1999) ("Because of the

intensely factual nature of trademark disputes, summary judgment is generally disfavored in the

trademark arena.").


        A.      Counts One and Two – Infringement and Unfair Competition

        Counts One and Two of Steak Umm's complaint allege trademark infringement under 15

U.S.C. §§ 1114-1118 and unfair competition/false designation of origin under 15 U.S.C. §

1125(a).  Claims for trademark infringement and unfair competition are analyzed under identical

standards.  A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 210 (3d Cir

2000).  To prove a *prima facia* case under either section, a plaintiff must show that: (1) the

5

trademark that is being infringed is valid, (2) the plaintiff owns the trademark in question, and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion. Id. The validity and ownership of the "Steak Umm" mark are not contested.

The success of Counts One and Two therefore depends on Steak Umm's ability to show that there is a likelihood of confusion caused by Steak 'Em-Up's name and logo. This is a source confusion case, meaning Steak Umm's claim is premised upon the allegation that consumers will believe Steak 'Em-Up is affiliated with or related in some way to Steak Umm or that it uses Steak Umm's products.[3] To prove this element, a plaintiff need not show actual confusion, only that confusion is likely. Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 472 (3d Cir. 1994). In the Third Circuit, the ten-part Lapp test determines whether there is a likelihood of consumer confusion between goods, whether they directly compete or not.[4] A & H Sportswear, 237 F.3d at 215; Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir. 1983). The Lapp factors are:

1) The degree of similarity between the owner's mark and the alleged infringing mark;
2) The strength of the owner's mark;
3) The price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;
4) The length of time the defendant has used the mark without evidence of actual confusion arising;
5) The intent of the defendant in adopting the mark;
6) The evidence of actual confusion
7) Whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;
8) The extent to which the targets of the parties' sales efforts are the same;

---

[3] This is in contrast to "product confusion," where a plaintiff is concerned that a consumer looking to buy its product will mistakenly buy a product produced by someone else.

[4] Some cases decided prior to 2000 apply the Lapp test only if the two parties' goods do not directly compete and consider only mark similarity for directly competing goods. This distinction is not relevant in this case, as the Third Circuit held in A&H Sportswear that the Lapp factors may be used for both competing and non-competing goods. See A & H Sportswear, 237 F.3d at 215.

9)  The relationship of the goods in the minds of the consumers, whether because of the near-identity of the products, the similarity of function, or other factors;

10) Other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market.

A & H Sportswear, 237 F.3d at 215.  Not all ten factors are necessary to determine that there is a likelihood of confusion, and a likelihood can be found even if a majority of the factors do not show confusion.  Id. at 216.  They are not to be "mechanically tallied," but are rather tools to guide a qualitative decision.  Id. at 216.

### 1.      Factor One: Degree of Similarity

"The single most important factor in determining likelihood of confusion is mark similarity."  A & H Sportswear, 237 F.3d at 216.  Marks are not compared side by side, but are examined to determine if they create the same overall impression when viewed by an average consumer in isolation.  Id. at 216-217; Fisons, 30 F.3d at 477-78.  The overall impression of the mark is created by the sight, sound, and meaning of the mark.  A & H Sportswear, 237 F.3d at 216-217.  Marks should be viewed in their entirety, but more dominant and forceful aspects of the mark should be given more weight.  Country Floors, 930 F.2d at 1065.  The degree of similarity needed to show likelihood of confusion varies: it is lower when the products are directly competitive and higher when they are not.  Sabinsa Corp. v. Creative Compounds, LLC, 609 F.3d 175, 183-84 (3d Cir. 2010).

The evidence shows that the marks sound similar, but are visually distinct.  Steak 'Em-Up's gangster logo distinguishes it significantly from Steak Umm's marks, but there are some auditory similarities between the two.  The parties dispute the degree of competition between

them, and do not agree on the dominant portion of each party's mark.  With such issues

contested, it is difficult to weigh this factor in favor of either party.

### 2.        Factor Two: Strength of the Mark

The strength of a mark is measured by (1) the distinctiveness or conceptual strength of

the mark, and (2) the commercial strength or marketplace recognition of the mark.  Freedom

Card, Inc. v. JP Morgan Chase & Co., 432 F.3d 463, 472 (3d Cir. 2005).  The conceptual

strength of the mark is a question of fact.  See E.T. Browne Drug Co. v. Cococare Prods. Inc.,

538 F.3d 185, 192 (3d Cir. 2008) ("Whether 'Cococare Butter Formula' is generic or descriptive,

and whether that term has acquired secondary meaning, are questions of fact.").  The conceptual

strength of a mark falls into one of four categories (from strongest to weakest): (1) arbitrary or

fanciful ("Kodak"); (2) suggestive ("Coppertone"); (3) descriptive ("Security Center"); and (4)

generic ("Diet Chocolate Fudge Soda").  Freedom Card, 432 F.3d at 472 (citing A&H

Sportswear, 237 F.3d at 221).  "Stronger marks receive stronger protection."  Id.  Arbitrary or

fanciful marks are marks that suggest nothing about the product and bear no logical relation to

the actual goods.  A & H Sportswear, 237 F.3d at 221 (internal citation omitted).  Suggestive

marks "require consumer imagination, thought, or perception to determine what the product is."

Id. at 221-22.  Descriptive marks "convey an immediate idea of the ingredients, qualities, or

characteristics of the goods."  Id. at 222 (internal quotations omitted).  Generic marks are the

common descriptive name of the product class.  Id.  Protection under the Lanham Act is only

given to arbitrary or fanciful marks, suggestive marks, and descriptive marks with a secondary

meaning, with greater protection reserved for arbitrary or fanciful marks and suggestive marks.

Id.

With respect to the second prong of the test measuring the strength of a mark, commercial strength is measured by factual evidence of marketplace recognition.  Urban Outfitters, Inc. v. BCBG Max Azria Group, Inc., 511 F.Supp. 2d 482, 493 (E.D. Pa. 2007).  Such evidence includes records showing the nature of the mark, the outlets in which the relevant products are sold, the advertising and marketing history behind the mark, and its position in the marketplace.  See id.

There is a genuine dispute regarding the category into which the Steak Umm mark falls. On one hand, it could be argued that Steak Umm's mark is suggestive: the word "steak" suggests a food product, but the consumer is left with only that, and must conclude on his own what the product is.  This would make the Steak Umm mark strong.  On the other hand, the mark could be descriptive.  "Steak" shows that the product contains steak, and given the relatively few types of steak products on the market, the consumer does not need to use his imagination to determine what exactly Steak Umm produces.  Combined with the fact that there is no evidence on record showing secondary meaning of the Steak Umm mark, this would suggest a weak mark.  The category into which a mark falls is a question of fact.  This factor does not clearly favor one party or the other.

### 3.      Factor Three: Price of Goods and Sophistication of Consumers

The more sophisticated the consumer, and the more care and attention involved in purchasing a product, the less likely confusion becomes. EMSL Analytical, Inc v. Testamerica Analytical Testing Corp., No. 05-5259, 2006 WL 892718 at *8 (D.N.J. Apr. 4, 2006).  Price is relevant to the likelihood of confusion inquiry because consumers are likely to exercise less caution when purchasing inexpensive products than they are when purchasing expensive products, and vice versa.  McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC, 511 F.3d

350, 363-64 (3d Cir. 2007) (citing <u>Versa Prods. Co., Inc. v. Bifold Co. (Mfg.) Ltd.</u>, 50 F.3d 189, 204-05 (3d Cir. 1995).  Inexpensive items therefore tend to have a greater probability of creating confusion.  If the difference in price between two products is large enough that they are purchased by two entirely different classes of people, confusion is less likely.  <u>See</u> J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u> § 24:52 (4th ed. 2003); <u>R.J. Ants, Inc. v. Marinelli Enter., LLC</u>, 771 F. Supp. 2d 475, 494-95 (E.D. Pa. 2011).

The evidence on record shows that this factor weighs in favor of Steak Umm.  As both parties' products are inexpensive and the consumers of each are not clearly sophisticated, they are likely to pay less attention when exercising their purchasing power, and confusion is therefore more likely.

### 4.   Factors Four and Six: Length of Time Defendant Used Mark Without Actual Confusion; Evidence of Actual Confusion

"[T]wo parties' concurrent use of similar marks for a sufficient period of time without evidence of actual consumer confusion about the source of the products allows an inference that future consumers will not be confused either."  <u>Kos Pharm., Inc. v. Andrx Corp.</u>, 369 F.3d 700, 717 (3d Cir. 2004) (citing <u>Fisons</u>, 30 F.3d at 476) (internal quotations omitted).  This factor is weighed alongside evidence of actual confusion.  "Evidence of actual confusion is not required to prove likelihood of confusion" and, as it is generally difficult to find, it is highly probative where present.  <u>Checkpoint Sys., Inc. v. Checkpoint Software Tech., Inc.</u>, 269 F.3d 270, 291 (3d Cir. 2001).  Evidence of actual confusion will weigh highly in favor of a plaintiff, but courts are cautioned to view isolated instances of confusion with skepticism.  <u>See A & H Sportswear</u>, 237 F.3d at 227 (citing <u>World Carpets, Inc. v. Dick Litterell's New World Carpets</u>, 438 F.2d 482, 489 (5th Cir. 1971) and <u>Amstar Corp. v. Domino's Pizza, Inc.</u>, 615 F.2d 252, 263 (5th Cir.1980)).

There is a genuine dispute as to whether actual confusion has occurred.  According to Steak 'Em-Up, no customer has ever asked about Steak Umm products when shopping in its store.  Steak Umm asserts that its Google searches are evidence that actual confusion has occurred.  This argument is problematic for a number of reasons.  First, Steak Umm performed Google searches for the term "steak um up," a phrase not used by Steak 'Em-Up in any of its marks or advertising.  This search revealed only that some restaurant websites list "Steak Um Up" as a restaurant at Steak 'Em-Up's Philadelphia address.  Second, given that the terms used are not necessarily terms a consumer would search for, and that restaurant websites are not actual consumers, these searches alone are weak evidence, if evidence at all, of consumer confusion. Steak Umm's survey of consumers is also not evidence of actual confusion.  Surveys are only evidence of actual confusion if they replicate the real world setting in which a consumer would encounter the mark.  See Perlman, "The Restatement of the Law of Unfair Competition: A Work in Progress," 80 Trademark Rep. 461, 472 (1990).  Steak Umm's survey was conducted online and using only the names of each company.  It did not incorporate either party's logo or the packaging that accompanies the products.  This is not how a consumer would encounter either party's products in a real world setting and is not strong evidence of actual confusion.

### 5.    Factor Five: Intent of Defendant In Adopting the Mark

In analyzing the intent of the defendant, courts are to consider (1) whether that defendant chose a mark to intentionally confuse consumers, and thereby capitalize on the senior mark's goodwill, and (2) whether the defendant used adequate care in investigating its mark prior to adoption.  Sabinsa Corp., 609 F.3d at 187 (citing Kos, 369 F.3d at 721).

The only facts on record regarding the intent of Steak 'Em-Up in choosing its store name and logo suggest no connection to Steak Umm or an intent to capitalize on the goodwill of Steak

11

Umm's marks.  Instead, and as clearly evidenced by the gangster logo and Michael Lane's deposition, Steak 'Em-Up intended to use a gangster theme throughout its store and in its advertising.  Steak Umm's marks have nothing to do with this theme, and there is no evidence that Steak 'Em-Up had any intent to purposefully capitalize on any goodwill the Steak Umm marks may have.  This factor favors Steak 'Em Up.

> **6.      Factors Seven and Eight: Channels of Trade and Advertisement; Extent That Sales Targets Are the Same**

Factors seven and eight are closely related.  If parties' advertising and marketing campaigns are similar and/or their targeted customers are similar, the likelihood of confusion between their marks is greater.  <u>Sabinsa Corp.</u>, 609 F.3d at 188.

These factors weigh in favor of Steak 'Em-Up.  While the two companies use some of the same means of advertising – specifically, the internet and newspapers – there is little geographical or intended-customer overlap in their advertising campaigns.  Steak 'Em-Up's advertisements are exclusively local, and Steak Umm's are entirely national.  The two products appeal to distinct sets of consumers.  Steak Umm targets grocery shoppers looking to buy frozen steaks to cook at home.  Steak 'Em-Up targets customers who are looking for unfrozen, prepared foods to eat in or take out of its restaurant.  Given the differences in advertising and the different target consumers, confusion is less likely.

> **7.      Factors Nine and Ten: Relationship of Goods in the Minds of Consumers; Other Facts Suggesting That The Consuming Public Might Expect the Prior Owner to Manufacture Both Products, Manufacture a Product In The Defendant's Market, or Expand Into the Defendant's Market**

In assessing factor nine, a court will analyze the relationship of the parties' goods in the minds of consumers.  This involves considering what products the parties make, how they sell the products, and to whom they sell the products.  Along the same lines, factor ten seeks to

determine whether a reasonable consumer could conclude that a plaintiff has expanded into the defendant's market, regardless of whether the plaintiff actually has expanded or has any intent to expand.  See Wynn Oil Co. v. Thomas, 839 F.2d 1183, 1187 (6th Cir. 1988) (finding consumer of a company's car wash products would "easily assume" that the company expanded into the car wash service business).

There is little evidence in the record regarding how consumers perceive the products made by Steak Umm and Steak 'Em Up.  There are clear differences between the products, how they are sold, and to whom they are sold.  On the other hand, as in Wynn Oil, it would not necessarily be a stretch for a consumer to conclude that Steak Umm, a maker of frozen steak products, had expanded into the prepared food market, since that market is at least somewhat related to the frozen food market.  Given the lack of evidence with regard to the mindset of consumers, this conclusion cannot be made on summary judgment.

**8.   Genuine Disputes of Material Fact Preclude Summary Judgment on Counts One and Two**

Genuine disputes of material fact exist as to nearly every Lapp factor.  Although some factors weigh in favor of Steak Umm, others favor Steak 'Em-Up, and still others do not clearly favor one side or the other.  Given the fact-heavy nature of the Lapp inquiry, summary judgment is not appropriate. Taking into account the evidence presented for each factor, a reasonable jury could find for either party in determining the likelihood of confusion, and thus could find for either party on Counts One and Two.  Accordingly, both parties' motions for summary judgment as to Counts One and Two are denied.

**B.      Count Three: Federal and State Dilution**

Steak Umm makes both federal and state law claims of dilution.  Federal dilution claims are governed by the Trademark Dilution Revision Act of 2006 ("TDRA"). To make a successful claim under the TDRA, a plaintiff must show that: (1) its mark is famous; (2) the defendant is making use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use is likely to cause dilution by either "tarnishment" or "blurring."[5]  15 U.S.C. § 1125(c)(1).

A mark is famous for dilution purposes if it is "widely recognized by the general consuming public of the United States."  15 U.S.C. § 1125(c)(2)(A).  A mark must be famous at the time of the junior (newer) mark's first commercial use.  See Network Network v. CBS Inc., 54 U.S.P.Q.2d 1150, 1153 (C.D. Cal. 2000); Nissan Motor Co. v. Nissan Computer Corp., 378 F.3d 1002, 1012 (9th Cir. 2004).  A plaintiff must show "evidence and proof of the timing of two events: when the plaintiff's mark achieved that elevated status called 'fame' and when the defendant made its first use of the mark." Chatam Int'l, Inc. v. Bodum, Inc., 157 F. Supp. 2d 549, 560 (E.D. Pa. 2001) (citing McCarthy, supra § 24:96).  A dilution claim is designed to protect only the strongest marks.  McCarthy, supra § 23:20.50.  A mark must have a distinctiveness and strength far beyond the minimum which is needed to qualify as a trademark.  Avery Dennsion Corp. v. Sumpton, 189 F.3d 868, 875 (9th Cir. 1999).  There are four statutory factors courts are invited to consider in determining whether a mark is famous:

1)  The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties;
2)  The amount, volume, and geographic extent of sales of goods or services offered under the mark;

---

[5] The requirements for a Pennsylvania state law dilution claim are nearly identical to the federal statue with the exception that under Pennsylvania law a plaintiff must show that the defendant actually caused dilution for the last element of the claim and not just that such dilution is likely, as required by the federal statute. 54 Pa. Cons. Stat. § 1124.

3)  The extent of actual recognition of the mark;
4)  Whether the mark was registered under the Act of March 3, 1881, or the Act
    of February 20, 1905, or on the principal register.

15 U.S.C. 1125(c)(2)(A)(i)-(iv).  The Third Circuit has held that not every factor of the statute

must be strictly applied.  See Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.,

212 F.3d 157, 166 (3d Cir. 2000) (It was not an abuse of discretion for the district court to omit

three factors in its discussion of dilution).

 The nature of each factor suggests the weight it should be given.  See McCarthy, supra §

24:106.  Factor three, the extent of actual recognition, is perhaps the most significant factor, as it

directly shows how widely recognized the mark is.  Id.  Factors one and two provide

circumstantial evidence because they require the court to infer that advertising and sales have an

impact on the "general consuming public" and make the brand famous.  Id.  Accordingly, these

factors are not necessarily as strong as factor three.  Factor four, registration, is only persuasive

on its own if used to show that a mark is *not* famous.  Id.  Registration on its own does not show

that a mark has reached the high level of distinction required for dilution claims, as only a subset

of registered marks reach this level of distinction.  Id.; Board of Regents, Univ. of Texas Sys. ex

rel. Univ. of Texas at Austin v. KST Elec., Ltd., 550 F. Supp. 2d 657, 675 (W.D. Tex. 2008).

The parties do not dispute that Steak Umm's mark is registered.

 Evidence of fame is necessary for a successful dilution claim.  A plaintiff's conclusory

statement that its products are well-known and highly regarded is insufficient evidence of fame.

See Biosafe-One, Inc. v. Hawkes, 524 F. Supp. 2d 452, 467 (S.D.N.Y. 2007).  A court need not

evaluate a dilution claim if fame is not proven.  Id.

 In the present case, the issue is timing: Steak Umm must show that its mark was famous

prior to Steak 'Em-Up's opening in October 2005.  Steak Umm has evidence that the mark was

federally registered prior to that date.  However, it lacks evidence on the other three factors,

including whether its mark was famous prior to Steak 'Em Up's use.  The requirement that the

defendant's use occurred after the plaintiff's mark became famous "reflects the fair and equitable

principle that one should not be liable for dilution by use of a mark which was legal when first

used."  Chatam Int'l, 157 F. Supp. 2d at 560 (quoting McCarthy, supra at § 24:96).  Steak Umm

has conceded that it possesses no data regarding advertising or sales prior to Szortyka taking

over the company in 2006.  Szortyka Dep. 38:2-39:5, 76:5-15.  If Steak Umm had such data it

could attempt to prove that its marks were famous prior to 2006 by relying on evidence of the

geographic extent of its advertising and marketing and the volume of its sales.  Without such

information, Steak Umm has not proved that the Steak Umm mark was famous prior to 2006.

        The only evidence on the record regarding the state of the Steak Umm marks prior to

2006 comes from Szortyka's deposition and suggests that the mark was *not* famous:

> Q.      . . . you were quoted as saying the following [in 2007]: "There was a time
>         when everyone knew Steak-Umm, but it has lost a tremendous amount of
>         brand identity."
>         Do you recall making that statement?
> A.      No, I do not.
> Q.      Is that a true statement?
> A.      Yes, it is.

Szortyka Dep. 79:9-16.  Szortyka then went on to comment that consumers had in fact forgotten

about the Steak Umm brand:

> Q.      What was the basis of that statement that the Steak-Umm brand has lost a
>         tremendous amount of brand identity?
> A.      Like anything, because it wasn't advertised to the consumers, they had
>         forgotten about it, and we knew we needed to resurrect it.

Id. at 79:24-80:4.  Not only has Steak Umm conceded, through Szortyka's testimony, that its

brand lost most of its identity prior to 2006, it has also failed to conduct or produce surveys

showing actual recognition of the Steak Umm mark.

The standard for a mark to be considered famous for dilution purposes is high.  From the evidence on the record, Steak Umm can prove only one of the four statutory factors for fame: federal registration.  While a plaintiff in the Third Circuit does not need to prove all four factors, federal registration is not sufficient evidence of fame on its own.  Due to this lack of evidence, no reasonable jury could conclude that the Steak Umm mark was famous in October 2005 or that the mark was diluted by Steak 'Em's Up's conduct.  Summary judgment will be granted in favor of Steak 'Em-Up as to Count Three of Steak Umm's amended complaint.

### C.       Monetary Damages

In its complaint, Steak Umm seeks, in addition to injunctive relief, (1) an accounting of Steak 'Em-Up's profits, (2) actual damages, (3) treble damages for deliberate and willful infringement, and (4) attorneys' fees.  It is important to note that the elements for the various forms of *recovery* under the Lanham Act are different from the elements required to show a *violation* of the Lanham Act, and should be assessed separately.  See Web Printing Controls Co. v. Oxy-Dry Corp., 906 F.2d 1202, 1204 (7th Cir. 1990) (finding that the district court erred in failing to distinguish between a Lanham Act violation and a Lanham Act remedy).  This is important in part because violations of the Lanham Act can be remedied in more ways than one. Id.  Thus, a plaintiff may be able to prove a violation of the Lanham Act, without providing evidence sufficient for an award of damages.

To recover actual damages, Steak Umm must prove "the defendant's Lanham Act violation, that the violation caused actual confusion among consumers . . . *and, as a result*, that [it] suffered actual injury, *i.e.,* a loss of sales, profits, or present value (goodwill)."  Id. at 1204-05 (emphasis added); McCarthy, supra § 30:74.  Treble damages can only be awarded if actual

damages are proven.  Caesars World, Inc. v. Venus Lounge, Inc., 520 F.2d 269, 274 (3d Cir.

1975).  Attorney's fees are not appropriate where there is no evidence of actual harm to the

plaintiff as a result of infringement. See Accu Personnel v. Accustaff, Inc., 846 F. Supp. 1191,

1215-16 (D.Del. 1994) (granting summary judgment on the issue of damages and attorneys' fees

where plaintiff failed to place evidence in the record of actual harm).

Steak Umm has conceded, through the testimony of Mr. Szortyka, that it has suffered no

financial harm as a result of Steak 'Em-Up's conduct:

> Q.     What financial damage - - at the time that the plaintiff brought the suit, it
>        was not suffering financial harm as a result of defendant's operation of its
>        convenience store Steak 'Em-Up, was it?
> A.     No.

Szortyka Dep. 21:10-14

> Q.     Since the Complaint was filed, the Steak Umm Company hasn't suffered
>        any financial harm as a result of defendant's operation of its stores, has it?
> A.     No.

Szortyka Dep. 21:23-22:1.  Because Steak Umm has suffered no actual harm, actual damages,

treble damages, and attorneys' fees are not appropriate.

"An accounting of the infringer's profits is available if the defendant is unjustly enriched,

if the plaintiff sustained damages, or if an accounting is necessary to deter infringement.  These

rationales are stated disjunctively; any one will do." Banjo Buddies, Inc. v . Renosky, 399 F.3d

168, 178 (3d Cir. 2005) (citing George Basch Co., Inc. v. Blue Coral, Inc., 968 F.2d 1532, 1537

(2d Cir. 1992)).  Disgorgement of profits is an equitable remedy that lies within the discretion of

the court.  See Merisant Co. v. McNeil Nutritionals, LLC, 515 F. Supp. 2d 509, 529 (E.D. Pa.

2007).  In order to support a claim for disgorgement of profits, "the plaintiff shall be required to

prove defendant's sales[.]"  15 U.S.C. § 1117(a).  In other words, summary judgment against the

plaintiff on its claim for disgorgement of profits "will only be granted if [Defendant is] able to

establish that the undisputed evidence produced by [the Plaintiff] is insufficient to satisfy the Lanham Act's requirement that Plaintiff "prove [Defendant's] sales only." <u>Members 1st Federal Credit Union v. Metro Bank</u>, No. 09-1171, 2011 WL 208743 at *4 (M.D.Pa. Jan. 21, 2011). Assuming the plaintiff has proven defendant's sales, a court shall then consider a number of factors to determine whether disgorgement of profits is appropriate.  These factors include, but are not limited to: "(1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off." <u>Banjo Buddies</u>, 399 F.3d at 175 (internal citation omitted).

Steak Umm did not allege in its complaint that Steak 'Em Up has made sales in any specific amount as a result of its alleged infringing use of the Steak Umm mark.  Nor has Steak Umm produced evidence of Steak 'Em Up's sales or profits at the summary judgment stage.  In analogous situations, courts have allowed claims for disgorgement of profits to proceed only where the plaintiff has produced some evidence of an alleged infringer's sales.  <u>See</u> <u>Members 1st</u>, 2011 WL 208743 at *5-6 (examining defendants' financial records to determine whether they showed income or sales from alleged infringing conduct); <u>Merisant</u>, 515 F. Supp. 2d at 528 (refusing to enter summary judgment on plaintiff's claim for an accounting of profits where the plaintiff asserted "that it will incur lost profits of $24 million as a result of [defendant's] allegedly false advertising and that [defendant] will realize approximately $20.1 million in profits on sales allegedly diverted from [the plaintiff] by virtue of this conduct).  Steak Umm has failed to meet its burden on its claim for disgorgement of profits, and Steak 'Em Up's motion for summary judgment will therefore be granted insofar as it seeks dismissal of Steak Umm's claims

for actual damages, treble damages, disgorgement of profits, and attorneys' fees.

## IV.    CONCLUSION

Because the likelihood of confusion question in this case is ill-suited for summary judgment determination, both parties' motions are denied with respect to Steak Umm's trademark infringement, unfair competition and false designation of origin claims.  Because Steak Umm has failed to provide sufficient evidence in support of its dilution claim, summary judgment is granted in favor of Steak 'Em-Up.  Because Steak Umm has failed to provide evidence of actual injury or Steak 'Em Up's sales, summary judgment on Steak Umm's claims for actual damages, treble damages, attorneys' fees, and an accounting of profits is granted in favor of Steak 'Em-Up.  An appropriate order follows.