# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THE STEAK UMM COMPANY, LLC,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | **NO. 09-2857** |
| | : | |
| **STEAK 'EM UP, INC.,** | : | |
| **Defendant.** | : | |

## M E M O R A N D U M

**STENGEL, J.**                                                    **April 11, 2012**

Steak Umm, a national seller of frozen steak and hamburger products wants Steak 'Em-Up, a South Philadelphia pizza shop and corner grocery, to change its name. Steak Umm alleges that the Steak 'Em-Up name infringes on its trademark and has filed claims under the Lanham Act for infringement, unfair competition and false designation of origin, as well as federal and state trademark dilution claims.

The parties filed cross-motions for summary judgment which were denied with respect to Steak Umm's trademark infringement, unfair competition and false designation claims. I granted summary judgment in favor of Steak 'Em-Up on the dilution claims and claims for actual damages, treble damages, attorney's fees, and an accounting of profits.[1] The only claim remaining is a request for an injunction to prevent trademark infringement. Each side presented its case in a bench trial and I make the following findings of fact and conclusions of law pursuant to FED. R. CIV. P. 52.

---

[1] See Summary Judgment Opinion and Order (Doc. Nos. 60 & 61), available at Steak Umm Co., LLC v. Steak 'Em Up, Inc., 2011 U.S. Dist. LEXIS 94088 (E.D. Pa. Aug. 23, 2011) (finding no evidence of actual injury or actual damages).

## I.   FINDINGS OF FACT

### A.   The Steak Umm Company, Inc.

1.      Steak Umm produces frozen sliced steak and hamburger products for sale in grocery stores across the United States.

2.      Steak Umm is a limited liability company created and existing under the laws of the State of Delaware, with its principal place of business in Reading, Pennsylvania.

3.      Gene Gagliardi, the founder of Steak Umm, conceived of the "Steak-umm" name for his product in 1975.[2]

4.      Steak Umm has marketed and sold frozen steak products using the "Steak Umm" mark since 1975.

5.      Steak Umm applied for and obtained a federal registration for the trademark "Steak-umm."  Registration No. 1,033,176 was issued in February 1976 (through a predecessor company) noting use of the mark "Steak-umm" since at least February 1975 for meat products, specifically steak.

6.      Steak Umm is currently owned by Quaker Maid Meats, Inc.  Sergei Szortyka, the president of Quaker Maid Meats, acquired Steak Umm in May 2006.

---

[2] Mr. Gagliardi's colorful testimony included a description of the etiology of the Steak Umm name.  Apparently, Mr. Gagliardi was quail hunting with two friends and focusing on the name of his new meat product more than he was concentrating on quail.  After a period of quail hunting and bourbon drinking, one of Mr. Gagliardi's fed up friends expressed his frustrations with Gagliardi's elevation of product naming over quail shooting and shouted "F*ck 'em, stick 'em with Steak Umm!"  From that moment, "Steak Umm," indeed stuck with Gagliardi and became the name of his new meat product.  The catchy phrase, and the chance to memorialize a presumably high moment of male bonding gave birth to the Steak Umm name.  It apparently has nothing to do with product quality, consumer appeal, taste or satisfying the appetite and everything to do with a memorable, if somewhat dubious, flourish.

7.     Quaker Maid Meats acquired Steak Umm solely for its customer list and intellectual property, and not for any other assets or equipment.

8.     Steak Umm advertises in print, on national television, and on the internet through its website.  It maintains a website for informational and marketing purposes.

9.     Steak Umm also began selling frozen hamburger products in 2009.

10.     Steak Umm sliced steaks are made from chopped and formed emulsified meat product that is comprised of beef trimmings left over after an animal is slaughtered and all of the primary cuts, such as tenderloin, filet, and rib eye are removed.  The emulsified meat is pressed into a loaf and sliced, frozen and packaged.

11.     Steak Umm ships 100% of its frozen products to supermarkets; the product is available to consumers in the frozen food section of the store.

12.     Steak Umm has advertised its products through nationwide television broadcasts, packaging, print advertising through supermarkets, in-store demonstrations, social media, word-of-mouth advertising, advertising at sporting events, as well as through the Internet and the Steak Umm website.

13.     Most recently, Steak Umm has aired 10-second television commercials during Jeopardy, Judge Judy, Blind Date, CNN Headline News, Dr. Phil, Family Feud, Millionaire, and Wheel of Fortune, all television shows with a national audience.

B.     **Steak 'Em-Up, Inc.**

14.     Steak 'Em-Up is a South Philadelphia steak sandwich shop which sells prepared food, including pizza and steak sandwiches.  It has takeout and delivery services.  Steak 'Em-Up's original location is at the corner of 11th and Shunk streets in

the City of Philadelphia.  Recently, a second store opened in Collingdale, Pennsylvania, a suburb of Philadelphia.

15.     Michael Lane, the founder of Steak 'Em-Up, began planning for his store in 2003.  He first wanted to use the name "Steak Out" to evoke the image of a "police stake out."  However, he learned the name "Steak Out" was used by a sandwich shop that had burned down less than one mile from his planned location.  Mr. Lane eventually decided on the name "Steak 'Em-Up," a play on the phrase "stick 'em-up."  It was his intention to refer to the criminal gangster culture that he considers to be popular in South Philadelphia.

16.     As part of establishing his brand, Mr. Lane developed a logo featuring a cartoon-gangster holding a hoagie as if it were a gun.  This logo accompanies the name "Steak 'Em-Up" in nearly all advertisements and signage.

17.     Mr. Lane formed the company on June 4, 2003, began construction at the Philadelphia location in 2004, and opened the doors of his retail grocery and take-out and delivery food service to the public in October 2005.

18.     Mr. Lane hired counsel in 2003 to incorporate his business and file all necessary papers with the Commonwealth of Pennsylvania.  He assumed that if the name "Steak 'Em-Up" was taken or unavailable he would not have been allowed to use the name.

19.     Steak 'Em-Up was incorporated under the laws of the Commonwealth of Pennsylvania, with its principal place of business at 2600 South 11th Street, Philadelphia, Pennsylvania.

20.     The grocery items available for purchase in Steak 'Em-Up's store include items typically found in a neighborhood convenience store, such as bread, milk, juice, eggs, canned goods, and paper products.

21.     The made to order items Steak 'Em-Up provides for take-out and delivery include appetizers, pizza, and a variety of sandwiches and salads.  Steak 'Em-Up's menu includes approximately 225 different items, eight of which are steak sandwiches and ten of which are variations of hamburgers.

22.     Steak 'Em-Up does not offer for sale or sell any frozen, thinly sliced steak or hamburger products and never has.  Steak 'Em-Up neither sells Steak Umm products nor does it use Steak Umm products in its sandwiches.

23.     Steak 'Em-Up uses 100% rib eye cut steak to make its sandwiches.  The rib eye is a higher quality meat than the pressed, emulsified meat mixture used to make the Steak Umm steak product.

24.     Steak 'Em-Up advertises in a local South Philadelphia paper, on local television, through its website, by distributing menus locally, and through word-of-mouth advertising.  Mr. Lane purchases television advertising on cable channels for viewing in two limited markets: South Philadelphia and Center City Philadelphia.

25.     Steak 'Em-Up's customers are typically persons who live or work within a short walking or driving distance from its two stores.  Delivery is available within approximately a two-mile radius from each store and Mr. Lane estimates that 90% of his customers live within a one-mile radius of each store.

26.     Mr. Lane is not aware of a single instance where a customer of his store has reported or questioned the source or sponsorship of Steak 'Em-Up's products.  Mr. Lane is not aware of any instance where a customer reported confusion about whether Steak 'Em-Up is affiliated with Steak Umm.

### C.     Steak Umm Is Made Aware of Steak 'Em-Up

27.     In 2009, Mr. Gagliardi's brother contacted Mr. Gagliardi and asked if he knew about Steak 'Em-Up.

28.     Mr. Gagliardi was mistaken as to the spelling of the Defendant's name and believed it was spelled "S-t-e-a-k-u-m-m U-p."

29.     Mr. Gagliardi called Mr. Szortkya because he did not know if there was a connection between Steak Umm and Steak 'Em-Up.

30.     Mr. Szortyka ran an internet search for "Steak Um Up" which returned results for both "Steak Um Up" and "Steak 'Em-Up," both of which showed the Defendant's Philadelphia address and phone number.

31.     "Steak Um Up" is not the name of the Defendant's store.

### D.     Similarity of Plaintiff and Defendant's Marks

32.     Steak Umm is a national seller of frozen products for resale in grocery supermarkets, whereas Steak 'Em-Up operates a corner grocery store and take-out and delivery pizza shop in two locations in Pennsylvania.

33.     Steak Umm and Steak 'Em-Up are not direct competitors.

34.     With respect to the appearance of the marks, the Court finds that the marks are visually distinct.  Examples of the two marks are shown below:

 

35.      "Steak-umm" is presented in commerce on frozen food boxes with only one capital letter, the "S," whereas "STEAK 'EM-UP" is presented on plaintiff's corner pizza shop sign and on menus in all capitals.

36.     Steak Umm products are sold in a red box and are accompanied by the words "Sliced Steaks" or "Burgers."  Steak 'Em-Up's menus and street signs are accompanied by the words "OPEN 7 DAYS" and "WE DELIVER."

37.     The Steak 'Em-Up mark is almost always accompanied by a distinctive cartoon character logo that looks like a mobster holding a hoagie as a machine gun.  The Steak Umm mark does not have a cartoon character on its boxes.  Instead, Steak Umm boxes contain an image of a prepared steak or burger product.  Since the defendant's inception, with the exception of an isolated period of a few months for radio advertisements, the defendant's public presentation of its brand always includes the mobster logo.

38.     With respect to the sound of the mark, the Court finds that the marks sound only nominally similar.   The term "Steak Umm" is two syllables, whereas "Steak 'Em-Up is three syllables.

39.     With respect to the meaning of the mark, the Court finds that the marks are dissimilar.  Mr. Szortyka testified that the "-umm" portion of the Steak umm mark makes a sound that connotes "tastiness," like "yumm."[3]   "Steak 'Em-Up" is a play on words of the phrase "Stick 'Em-Up,"  meaning "Stick them up."  The Court finds that "Steak umm" has a very different meaning from "Steak 'Em-Up.

E.       **Strength of the Plaintiff's Mark**

40.     The conceptual strength of the mark is a question of fact.  See E.T. Browne Drug Co. v. Cococare Prods. Inc., 538 F.3d 185, 192 (3d Cir. 2008) ("Whether 'Cococare Butter Formula' is generic or descriptive, and whether that term has acquired secondary meaning, are questions of fact.")

41.     The word "Steak" suggests a food product and the word "Umm" sounds like "mmm," a suggestion that the product tastes good.  The consumer is left with only this impression and must draw his own conclusions about the identity of the product.

42.     I find that the Plaintiff's mark is "suggestive" in that it suggests the nature of the product, but does not actually describe the product.[4]

43.     Steak Umm did not offer any records demonstrating factual evidence of marketplace recognition.  Steak Umm failed to put forth evidence of the outlets in which

---

[3] Mr. Gagliardi's testimony about the origin of the brand name "Steak Umm" suggests that the name had nothing to do with flavor or "tastiness."

[4] *See discussion of suggestive marks in Conclusions of Law, supra* at ¶¶ 20-29.

the relevant products are sold, the advertising and marketing history behind the mark, and its position in the marketplace.

**F.   Prices of Products**

44.     The price of Steak Umm sandwich steak varies throughout the United States, but is roughly $4 to $15 per package.  The range of the price is a function of the number of steak products within the package.

45.     The price of Steak Umm burger patties ranges from $8.99 to $10.99.  Like the sandwich steaks, the range of the price is a function of the number of burger patties within the package.

46.     The price points of Steak 'Em-Up's prepared food products vary from $6.00 sandwiches to $13.00 pizzas to $75.00 for a Stromboli tray.

47.     Steak Umm sandwich steak prices vary from $4 to $15 per package.  Steak 'Em-Up's prepared food products vary in cost, but a review of their store menu shows that most of their products fall within the $4 to $15 price range as well.  Specifically, their sandwich steaks are approximately $5 to $7.

48.     Steak Umm burger patties range from $8.99 to $10.99 and Steak 'Em-Up burgers range from $5 to $7.

**G.   Actual Confusion**

49.     The parties have used their respective marks concurrently for six years without a single reported instance of actual confusion by a consumer.

50.     Steak 'Em-Up is not aware of a single instance of actual consumer confusion since it opened its doors in 2005.

51.    Steak Umm is not aware of a single instance of actual confusion as to the source, sponsorship, or affiliation of the parties respective goods since Steak 'Em-Up opened its doors in 2005.

52.    The Defendant has never used the terms "steak um," "steak um up," or "steak 'em" (without the "up") to refer to its business.

53.    Plaintiff's Google searched revealed that some restaurant websites list "Steak Um Up" as a restaurant at Steak 'Em-Up's Philadelphia address.

54.    Plaintiff has produced no evidence that a potential consumer has, or is likely to, search the phrase "Steak um up" in an attempt to locate defendant on the internet.  Given that the terms used are not necessarily terms a consumer would search for, and that restaurant websites are not actual consumers, these searches alone are weak evidence, if evidence at all, of consumer confusion.

55.    The internet search results produced by the Plaintiff are not the Defendant's advertisements.  Steak 'Em-Up is not involved in directing, sponsoring, requesting or otherwise controlling the contents of the websites.

56.    There is no evidence indicating whether the "steak um up" listings were the results of a single typographical error in a database that was accessed and proliferated throughout the internet, or if each listing was independently created on those respective websites.  Regardless, these restaurant websites are not clear evidence of actual confusion by a consumer.

57.    I find that the Plaintiff's internet searches are not evidence of actual consumer confusion.

### H.    **Expert Survey**

58.    Plaintiff presented Robert Klein as an expert witness to offer an opinion measuring the likelihood of confusion between Steak Umm and Steak 'Em-Up.

59.    Mr. Klein designed, conducted, and analyzed a survey in an attempt to measure the likelihood of confusion between the Steak Umm name and the Steak 'Em-Up name.[5]  The survey included 607 respondents.

60.    Mr. Klein found that as many as 24.1% of the survey respondents were confused as to the source of products sold by Steak 'Em-Up because of the similarity of the names Steak Umm and Steak 'Em-Up.  He also found that as few as 12.9% of the survey respondents were confused.

61.    The Klein survey mixed inquiries about Steak 'Em-Up's use of Steak Umm products with inquiries about any "connection or affiliation" between Steak 'Em-Up and Steak Umm.  The Plaintiff has never contended that Steak 'Em-Up uses or serves Steak Umm products.  The evidence at trial establishes that Steak 'Em-Up has never served Steak Umm products in the past, does not presently serve Steak Umm products, and will not in the future serve or use Steak Umm products.[6]  The Klein survey focuses on an inquiry that has no relevance to this case and which has nothing to do with the likelihood

---

[5] In Question 1, respondents were asked "Do you believe that this restaurant [does serve or use the products you saw earlier] or do you believe this restaurant [does not serve or use the products you saw earlier]?"  The order of presentation of the two bracketed parts of the question was randomized.  For respondents who answered "no" and "I don't know" to Question 1, they were asked Question 4 which posed "Do you believe that this restaurant [is connected or affiliated with the company that puts out the products you saw earlier] or do you believe this restaurant [is not connected or affiliated with the company that put out the products you saw earlier]?"  The order of presentation of the two bracketed parts of the question was randomized.

[6] In fact, the owner of Steak 'Em-Up considers the pressed, emulsified meat product sold by Steak Umm to be inferior to the rib eye cut of steak he uses to make his sandwiches.

of confusion between the brands.  This point alone renders the survey unreliable as an indicator of the likelihood of confusion to the consumer.  With regard to the connection or affiliation inquiry, I find that the Klein survey unduly suggests to the survey participants that there may be some affiliation or connection simply by the use of the word "steak" in each name without any explanation or any additional information about the two entities.

## II.    CONCLUSIONS OF LAW

1.    Federal claims for trademark infringement and unfair competition are governed by the Lanham Act, 15 U.S.C. §§ 1051, *et. seq.*

2.    The purpose of the Lanham Act is to make "actionable the deceptive and misleading use of marks" and to "protect against unfair competition."  Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 767-68 (1992) (quoting 15 U.S.C. § 1127).

3.    To prevail on a claim for trademark infringement, a plaintiff must establish the following three elements: (1) the trademark that is being infringed is valid, (2) the plaintiff owns the trademark in question, and (3) the defendant's use of the mark is likely to cause confusion.  A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 210 (3d Cir. 2000).

4.    Federal trademark infringement, 15 U.S.C. §§ 1114-1118, and federal unfair competition, 15 U.S.C. § 1125(a), are measured by identical standards.  A & H Sportswear, Inc., 237 F.3d at 210.

5.      Here, the validity and ownership of the "Steak Umm" mark are not contested.

6.      Thus, the critical question before the Court is whether the typical consumer viewing Defendant's "Steak 'Em-Up" mark would assume the products and services it represents are associated with the Plaintiff's mark, "Steak Umm."[7]

7.      The Third Circuit has identified ten factors, known as the *Lapp* factors, to be considered when determining whether a likelihood of confusion exists:

> 1.   The degree of similarity between the owner's mark and the alleged infringing mark;
>
> 2.   The strength of the owner's mark;
>
> 3.   The price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;
>
> 4.   The length of time the defendant has used the mark without evidence of actual confusion arising;
>
> 5.   The intent of the defendant in adopting the mark;
>
> 6.   The evidence of actual confusion;
>
> 7.   Whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;
>
> 8.   The extent to which the targets of the parties' sales efforts are the same;
>
> 9.   The relationship of the goods in the minds of the consumers, whether because of the near-identity of the products, the similarity of function, or other factors;

---

[7] This is a source confusion case and is in contrast to "product confusion," where a plaintiff is concerned that a consumer looking to buy its product will mistakenly buy a product produced by someone else.

13

10. Other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market.

Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir. 1983).[8]

8.      An analysis of the *Lapp* factors overwhelmingly weighs in favor of Defendant Steak 'Em-Up and establishes that there is no likelihood of confusion between Steak Umm and Steak 'Em-Up.

**A.      First Factor – Plaintiff and Defendant's Marks Are Not Similar**

9.      "The single most important factor in determining likelihood of confusion is mark similarity." A & H Sportswear, 237 F.3d at 216.

10.      Marks are confusingly similar "if ordinary consumers would likely conclude that [the two products] share a common source, affiliation, connection or sponsorship." Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 477 (3d Cir. 1994).

11.      Marks are not compared side by side, but are examined separately to determine if they create the same overall impression when viewed by an average consumer in isolation. A & H Sportswear, 237 F.3d at 216-17.

---

[8] "None of these factors is determinative in the likelihood of confusion analysis and each factor must be weighed and balanced one against the other." Checkpoint Sys. Inc. v. Check Point Software Techs., Inc., 269 F.3d 270, 280 (3d Cir. 2001). The *Lapp* test need not be "followed precisely so long as the relevant comparisons suggested by the test are made." A & H Sportswear, 237 F.3d at 207. The District Court must provide an explanation for any of the *Lapp* factors it finds inapplicable or unhelpful. Id. at 214 n.8. The factors are not to be "mechanically tallied," but rather are tools to guide a qualitative decision. Id. at 216.

12.     The overall impression of the mark is created by the sight, sound, and meaning of the mark.  A & H Sportswear, 237 F.3d at 216-217.

13.     Marks should be viewed in their entirety, but more dominant and forceful aspects of the mark should be given more weight.  Country Floors, Inc., v. Gepner, 930 F.2d 1056, 1065 (3d Cir. 1991).

14.     The degree of similarity needed to show likelihood of confusion varies: it is lower when the products are directly competitive and higher when they are not.  Sabinsa Corp. v. Creative Compounds, LLC, 609 F.3d 175, 183-84 (3d Cir. 2010).

15.     Because the parties are not direct competitors, a higher degree of similarity is required to show likelihood of confusion.

16.     To say, as the plaintiff does here, that to the everyday consumer, "Steak Umm" and "Steak 'Em" are indistinguishable when spoken aloud, is misleading.  "Steak 'Em" is not the name of the Defendant.  The words "Steak 'Em-Up" are always read together when identifying the Defendant's product.  Defendant has never used "Steak 'Em" alone in its advertising efforts.  To simply say "Steak 'Em" would be the equivalent of saying "Stick 'Em" and omitting the "Up" in the well-known phrase.  I find that this is extremely unlikely to occur among consumers of Steak 'Em-Up's products.

17.     The evidence shows that the marks sound somewhat similar, but are visually distinct.  The marks have different appearances and meanings and sound only nominally similar.  Accordingly, this Court finds that the marks are not similar and weighs this factor in favor of the defendant.  *See Findings of Fact* ¶¶ 32 – 39.

**B.**     **Second Factor – Plaintiff's Mark is Not Strong**

18.     The second factor in the "confusion" analysis is the strength of the plaintiff's mark.

19.     The strength of a mark is measured by (1) the distinctiveness or conceptual strength of the mark, and (2) the commercial strength or marketplace recognition of the mark.  Freedom Card, Inc. v. JP Morgan Chase & Co., 432 F.3d 463, 472 (3d Cir. 2005).

### i.     Plaintiff's mark is suggestive

20.     The conceptual strength of the mark is a question of fact.  See E.T. Browne Drug Co. v. Cococare Prods., Inc., 538 F.3d 185, 192 (3d Cir. 2008) ("Whether 'Cococare Butter Formula' is generic or descriptive, and whether that term has acquired secondary meaning, are questions of fact.").

21.     The conceptual strength of a mark falls into one of four categories (from strongest to weakest): (1) arbitrary or fanciful ("Kodak"); (2) suggestive ("Coppertone"); (3) descriptive ("Security Center"); and (4) generic ("Diet Chocolate Fudge Soda").  Freedom Card, 432 F.3d at 472 (citing A&H Sportswear, 237 F.3d at 221).

22.     "Stronger marks receive stronger protection."  Id.

23.     Arbitrary or fanciful marks are marks that suggest nothing about the product and bear no logical relation to the actual goods.  A & H Sportswear, 237 F.3d at 221 (internal citation omitted).

24.     Suggestive marks "require consumer imagination, thought, or perception to determine what the product is."  Id. at 221-22.

25.     Descriptive marks "convey an immediate idea of the ingredients, qualities, or characteristics of the goods."  Id. at 222 (internal quotations omitted).

26.     Generic marks are the common descriptive name of the product class.  Id.

27.     Protection under the Lanham Act is only given to arbitrary or fanciful marks, suggestive marks, and descriptive marks with a secondary meaning, with greater protection reserved for arbitrary or fanciful marks and suggestive marks.  Id.

28.     "In classifying a mark, the Court does not look to the intent of the party choosing that mark.  Instead, the impact of the mark on the minds of prospective consumers is controlling."  Id.

29.     I conclude that the Plaintiff's mark is "suggestive" and deserves stronger protection than descriptive marks, but less protection than arbitrary or fanciful marks. *See Findings of Fact* ¶¶ 40 – 43.

> ## ii.     There is little evidence to show that the plaintiff's mark is commercially strong

30.     With respect to the second prong of the test measuring the strength of a mark, commercial strength is measured by factual evidence of marketplace recognition. Urban Outfitters, Inc. v. BCBG Max Azria Group, Inc., 511 F.Supp. 2d 482, 493 (E.D. Pa. 2007).

31.     Such evidence includes records showing the nature of the mark, the outlets in which the relevant products are sold, the advertising and marketing history behind the mark, and its position in the marketplace.  See id.

32.     Mr. Gagliardi opined that Steak Umm has a "92% awareness in the marketplace" and, as a result, commands a premium on price.  Steak Umm did not offer any evidence to corroborate or substantiate this self-serving opinion.  Steak Umm did not offer records showing the outlets in which the relevant products are sold, the advertising and marketing history behind the mark, or its position in the marketplace.  Steak Umm did not produce surveys showing actual recognition of the Steak Umm mark.  Steak Umm did not demonstrate the frequency in which its television ads appear and offered no documentary evidence to corroborate the mark's commercial strength.  Steak Umm's product is available for purchase in some supermarkets across the United States and that is some evidence of strength.  However, that fact alone does not warrant the conclusion that the Steak Umm mark is commercially strong.  See First Keystone Federal Savings Bank, 896 F. Supp at 461 (E.D. Pa. 1995).  The enthusiastic but unsupported opinion of Mr. Gagliardi is not alone sufficient to establish the commercial strength of the Steak Umm mark.

33.     The Plaintiff failed to demonstrate that its mark is commercially strong.  Accordingly, the second factor weighs in favor of the Defendant.  The Steak Umm brand is, at best, suggestive, and while deserving protection, is not as conceptually strong as an arbitrary or fanciful mark.

## C.     Third Factor – The Parties Sell Different Products at Similar Price Points

34.     The more sophisticated the consumer, and the more care and attention involved in purchasing a product, the less likely confusion becomes. EMSL Analytical,

Inc v. Testamerica Analytical Testing Corp., No. 05-5259, 2006 WL 892718 at *8
(D.N.J. Apr. 4, 2006).

35.     Price is relevant to the likelihood of confusion inquiry because consumers
are likely to exercise less caution when purchasing inexpensive products than they are
when purchasing expensive products, and vice versa.  McNeil Nutritionals, LLC v.
Heartland Sweeteners, LLC, 511 F.3d 350, 363-64 (3d Cir. 2007) (citing Versa Prods.
Co., Inc. v. Bifold Co. (Mfg.) Ltd., 50 F.3d 189, 204-05 (3d Cir. 1995).

36.     Inexpensive items therefore tend to have a greater probability of creating
confusion.  If the difference in price between two products is large enough that they are
purchased by two entirely different classes of people, confusion is less likely.  See J.
Thomas McCarthy, Trademarks and Unfair Competition § 24:52 (4th ed. 2003); R.J.
Ants, Inc. v. Marinelli Enter., LLC, 771 F. Supp. 2d 475, 494-95 (E.D. Pa. 2011).

37.     This factor weighs slightly in favor of the Plaintiff because the parties'
products are similar, i.e., both are food products, and both are, generally speaking,
inexpensive.  There was no evidence in this case about the level of sophistication of the
average consumer of each product.

38.     I will accord this factor less weight in my analysis because the goods
offered by each party are somewhat distinct.  Steak Umm targets consumers who wish to
buy a frozen meat product in the supermarket and cook a meal at home.  Steak 'Em-Up
targets the consumer who wishes to have a meal prepared for him.  While there will
invariably be some overlap in targeting prospective consumers, i.e. those who enjoy steak
sandwiches will be drawn to both products, the context within which the consumers enjoy

the steak sandwiches sets the products apart.  I find this factor less applicable than the others and accord it little weight.  *See Findings of Fact* ¶¶ 44 – 48.

> **D.      Fourth and Sixth Factors – There is No Actual Confusion**

39.      The fourth factor concerns the length of time defendant has used the mark without evidence of actual confusion arising.

40.      "[T]wo parties' concurrent use of similar marks for a sufficient period of time without evidence of consumer confusion about the source of the products allows an inference that future consumers will not be confused either."  Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700, 717 (3d Cir. 2004) (citing Fisons, 30 F.3d at 476) (internal quotations omitted).

41.      This factor is weighed alongside evidence of actual confusion, the sixth factor.

42.      "Evidence of actual confusion is not required to prove likelihood of confusion" and, as it is generally difficult to find, it is highly probative where present. Checkpoint Sys., Inc. v. Checkpoint Software Tech., Inc., 269 F.3d 270, 291 (3d Cir. 2001).

43.      Evidence of actual confusion will weigh highly in favor of a plaintiff, but courts are cautioned to view isolated instances of confusion with skepticism.  See A & H Sportswear, 237 F.3d at 227 (citing World Carpets, Inc. v. Dick Litterell's New World Carpets, 438 F.2d 482, 489 (5th Cir. 1971) and Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 263 (5th Cir.1980)).

44.     There is no evidence of actual consumer confusion in this case.  *See Findings of Fact* ¶¶ 49 – 57.

45.     "In some cases, survey evidence can serve to demonstrate evidence of actual confusion, but only to the extent that the survey replicates the real world setting in which instances of actual confusion would occur."  Urban Outfitters, Inc. v. BCBG Max Azria Group, Inc., 511 F. Supp. 2d 482, 498 (E.D. Pa. 2007).

46.     Steak Umm's survey of consumers is not evidence of actual confusion nor is it evidence of likelihood of confusion.  *See* Discussion, *supra* at p. 28.

47.     The fundamental flaws in Mr. Klein's survey render the results unreliable. Dr. Michael Rappeport, an expert in brand surveys testified for Steak 'Em-Up in this case and presented a critique of Mr. Klein's work.  Dr. Rappeport contends that Klein's data suggests that no more than 10% of those surveyed by Klein are likely to be confused.

48.     The court weighs this Lapp factor substantially in favor of the Defendant because there is no evidence of actual confusion, Mr. Klein's survey results are flawed, and there is no evidence demonstrating a likelihood of confusion.  Even if this Court were to give the Plaintiff the benefit of the Defendant's expert's estimate of a 10% likelihood of confusion, this factor would still weigh substantially in favor of the Defendant. Furthermore, even if this Court accepted Mr. Klein's flawed survey analysis of 12.9% likelihood of confusion, given the lack of actual confusion, this factor would weigh in favor of the Defendant.  After considering the testimony presented at trial and the numerous submissions to the Court, I find Dr. Rappeport's critique of Mr. Klein's survey particularly credible and helpful.  Accordingly, I find there is no likelihood of confusion

to demonstrate actual confusion, and given the lack of actual confusion, these factors weigh substantially in favor of the Defendant.

### E.      Fifth Factor – Defendant Did Not Intend to Cause Confusion

49.     When analyzing the intent of the Defendant, courts are to consider (1) whether that defendant chose a mark to intentionally confuse consumers, and thereby capitalize on the senior mark's goodwill, and (2) whether the defendant used adequate care in investigating its mark prior to adoption.  Sabinsa Corp., 609 F.3d at 187 (citing Kos, 369 F.3d at 72 n. 1).

50.     "[E]vidence of intentional, willful and admitted adoption of a mark closely similar to the existing marks weighs strongly in favor of finding the likelihood of confusion."  Checkpoint, 269 F.3d at 286.  This inquiry extends beyond asking whether a defendant purposely chose its mark to promote confusion and appropriate the prior user's good will.  Fisons Horticulture, Inc., 30 F.3d at 479.

51.     "The adequacy and care with which a defendant investigates and evaluates its proposed mark, and its knowledge of similar marks or allegations of potential confusion, are highly relevant."  Kos Pharms, Inc., 369 F.3d at 721.

52.     The record clearly indicates that Mr. Lane did not intend to capitalize on the goodwill of the Steak Umm mark when choosing his mark.  Mr. Lane also testified credibly that he did not intend for his store name and logo to suggest a connection to Steak Umm.  *See Findings of Fact* ¶¶ 15 – 19.

53.     Accordingly, this factor significantly favors Steak 'Em-Up because Mr. Lane did not have an intent to cause confusion.  Plaintiff has produced no evidence of any intent to cause confusion by the Defendant.

**F.      Seventh and Eighth Factors: The Companies Use Only Some of the Same Forms of Advertisement But Target Different Customers**

54.     Factors seven and eight are closely related.

55.     The seventh factor for this Court to consider is whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media.  Strike Holdings LLC v. UC Strikes, LLC, 2005 U.S. Dist. LEXIS 15398, at *25.

56.     "[T]he greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion."  Checkpoint, 269 F.3d at 288-89.

57.     This is a "fact intensive inquiry" that requires a court to examine the "media the parties use in marketing their products as well as the manner in which the parties use their sales forces to sell their products to consumers."  Id. at 289.

58.     The eighth factor looks to whether the "parties target their sales efforts to the same consumers."  Checkpoint, 269 F.3d at 289.

59.     The two companies use only some of the same channels of advertising – specifically the internet and newspapers.  However, there is little geographical or intended customer overlap in their advertising campaigns.

60.     Steak 'Em-Up targets customers who are local, whereas Steak Umm targets customers nationally.  Steak 'Em-Up delivers solely within a two-mile radius of its store,

and estimates that an overwhelming majority of its customers live within a one-mile radius.

61.    Steak Umm's television commercials are broadcast nationwide.  Steak 'Em-Up's television commercials are broadcast in the Philadelphia region only.  *See Findings of Fact* ¶¶ 12, 24.

62.    Steak Umm targets grocery shoppers looking to buy frozen steaks to cook at home, whereas Steak 'Em-Up targets customers who are looking for unfrozen, prepared foods to take out of its restaurant.

63.    Given the differences in advertising and the different target consumers, I find that these factors overwhelmingly weigh in favor of Steak 'Em-Up.

**G.    Factors Nine and Ten: There is No Relationship Between the Goods in the Minds of Consumers and The Consuming Public Does Not Expect the Prior Owner to Manufacture Both Products, Manufacture a Product In The Defendant's Market, or Expand Into the Defendant's Market**

64.    In assessing factor nine, a court will analyze the relationship of the parties' goods in the minds of consumers.

65.    "The question is how similar, or closely related, the products are."  <u>Kos Pharms., Inc.</u>, 369 F.3d at 723.

66.    This factor focuses on the nature of the products themselves, asking whether it would be reasonable for consumers to associate them or view them as related.  <u>See</u> <u>id.</u>

67.    Courts may consider "whether buyers and users of each parties' goods are likely to encounter the goods of the other, creating an assumption of common source[,] affiliation or sponsorship." Checkpoint, 268 F.3d at 286.

68.    Similarly, factor ten seeks to determine whether a reasonable consumer could conclude that a plaintiff has expanded into the defendant's market, regardless of whether the plaintiff actually has expanded or has any intent to expand. See Wynn Oil Co. v. Thomas, 839 F.2d 1183, 1187 (6th Cir. 1988) (finding consumer of a company's car wash products would "easily assume" that the company expanded into the car wash service business).

69.    At trial, a stipulation established that twelve customers of Steak 'Em-Up were aware of the Steak Umm brand products at the time the Defendant opened its store, and did not believe Steak 'Em-Up was connected to the Steak Umm company. These consumers did not believe that Steak 'Em-Up was related to Steak Umm.

70.    I conclude that there are clear differences between the products, how they are sold, and to whom they are sold. I conclude that the consuming public does not expect that Steak Umm manufactures Steak 'Em-Up products nor does it expect Steak Umm to expand into Steak 'Em-Up's market. Accordingly, these factors substantially favor the Defendant.

### H.    **Weighing the *Lapp* Factors**

71.    Once each of the relevant Lapp factors are considered, the Court must balance the factors and "determine whether in the totality of the circumstances marketplace confusion is likely." Checkpoint, 269 F.3d at 296.

72.     An analysis of the *Lapp* factors in this matter leads to a conclusion that strongly weighs against finding a likelihood of confusion between the parties' marks.

73.     The marks have different appearances and meanings and sound only nominally similar.  The marks are not similar and the first factor weighs in favor of the Defendant.

74.     The Steak Umm brand is, at best, suggestive, and while deserving protection, is not as conceptually strong as arbitrary or fanciful marks.  The Plaintiff failed to demonstrate its mark is commercially strong, and therefore, this factor slightly favors the Defendant.

75.     Only the third factor weighs in favor of the Plaintiff because the parties' products are similarly inexpensive and the consumers of each are not necessarily sophisticated.  However, I accord the third factor less weight in my analysis because the goods offered by each party are somewhat distinct – Steak Umm targets consumers who wish to buy their meal in the supermarket and cook their meal at home whereas Steak 'Em-Up targets consumers who wish to have their meals prepared for them and order out. While there will invariably be some overlap in targeting prospective consumers, I find this factor less applicable than the other factors, and accord it little weight.

76.     The two most contested factors in this case, the fourth and sixth Lapp factors concerning actual confusion, strongly favor the Defendant.  I reached this conclusion because the parties' marks have coexisted for several years with no evidence of actual consumer confusion.   I declined to accept the Plaintiff's expert's conclusion that the likelihood of confusion between the parties' marks was either 12.9% or 24.1%

after finding several methodological flaws with the surveys.  *See* Discussion, *supra* at p. 28.  Even if Mr. Klein's expert opinion did not contain numerous fundamental flaws and I accepted his conclusion that 12.9% or 24.1% of consumers are likely to be confused, the overwhelming evidence in favor of Steak 'Em-Up under the other *Lapp* factors would nonetheless lead me to conclude that there is no likelihood of confusion.

77.     The fifth factor strongly favors the Defendant.  The record clearly indicates that Mr. Lane did not intend to capitalize on the good will of the Steak Umm mark when choosing the name of his business and designing his logo.  Mr. Lane did not intend for his store name and logo to suggest a connection to Steak Umm.  Accordingly, there was no intent to cause confusion.

78.     The seventh and eighth factors strongly weigh in favor of the Defendant because there are differences between the companies in advertising techniques and the companies target distinct types of consumers.

79.     The ninth and tenth factors substantially weigh in favor of the Defendant because there are clear differences between the products, how they are sold, and to whom they are sold.

80.     Thus, based on the totality of the circumstances, I conclude that there is no likelihood of marketplace confusion between the Plaintiff's mark and the Defendant's mark.

## I.     Plaintiff Failed to Establish Grounds for Injunctive Relief

81.     Trademark infringement amounts to irreparable injury as a matter of law. S&R Corp. v. Jiffy Lube, Int'l, Inc., 968 F.2d 371, 378 (3d Cir. 1992).

82.     Because Plaintiff failed to establish a likelihood of confusion between the parties marks as discussed above, the Plaintiff cannot prevail on its federal claim for trademark infringement and unfair competition under the Lanham Act.

83.     Accordingly, Plaintiff has failed to establish that it suffered irreparable harm and an injunction is improper.

## III.   DISCUSSION

A substantial portion of the trial involved testimony concerning the fourth and sixth *Lapp* factors regarding evidence of actual confusion.  Under the fourth factor, "two parties' concurrent use of similar marks for a sufficient period of time without evidence of consumer confusion about the source of the products allows an inference that future consumers will not be confused either."  Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700, 717 (3d Cir. 2004) (citing Fisons, 30 F.3d at 476) (internal quotations omitted).  This factor is weighed alongside evidence of actual confusion, the sixth factor.   "Evidence of actual confusion is not required to prove likelihood of confusion" and, as it is generally difficult to find, it is highly probative where present.  Checkpoint Sys., Inc. v. Checkpoint Software Tech., Inc., 269 F.3d 270, 291 (3d Cir. 2001).  There was certainly no evidence of actual confusion.  The plaintiff presented expert testimony to support its likelihood of confusion argument.

### A.   Expert Testimony

Plaintiff offered Robert Klein as an expert in measuring "likelihood of confusion" for trademark infringement.  Mr. Klein testified about his survey intending to measure the

likelihood of confusion between the Steak Umm name and the Steak 'Em-Up name.  Mr. Klein designed the study by showing restaurant names in black block letters without any logos because he understood that the Defendant's name was not always used in connection with the Defendant's logo.  The survey was conducted on the Internet among people who order take-out from or eat at a casual dining establishment and live within an approximate 30-mile radius of Steak 'Em-Up's South Philadelphia location.  The survey first showed pictures of the boxes for Steak Umm's frozen steak and burger products.  The survey then showed names of three restaurants in the Philadelphia area, Larry's Steaks, Philly Steak & Gyro Co. and either Steak 'Em-Up (in the test group) or The Steak Out (in the control group).  The respondents were shown each of these restaurants, one at a time in random order.

The respondents were then asked a series of questions about these restaurants and the Steak Umm products shown earlier.  In Question 1, respondents were asked "Do you believe that this restaurant [does serve or use the products you saw earlier] or do you believe this restaurant [does not serve or use the products you saw earlier]?"  The order of presentation of the two bracketed parts of the question was randomized.  If respondents answered "yes" to Question 1, they were then asked Question 2, which asked "Why do you say that?"  These respondents were also asked Question 3 which asked "Are there any other reasons?"

For respondents who answered "no" or "I don't know" to Question 1, they were asked Question 4 which posed "Do you believe that this restaurant [is connected or affiliated with the company that puts out the products you saw earlier] or do you believe

this restaurant [is not connected or affiliated with the company that put out the products you saw earlier]?"  The order of presentation of the two bracketed parts of the question was randomized.  If respondents answered "yes" to Question 4, they were then asked Question 5, which asked "Why do you say that?"  These respondents were also asked Question 6 which asked "Are there any other reasons?"  The survey included 607 respondents.

Mr. Klein's first analysis attempted to examine the specific reasons why people in the test group said they believed Steak 'Em-Up served or used Steak Umm products or why they believed the two companies were connected or affiliated.  Upon analyzing the survey results and the reasons noted by the respondents, Mr. Klein found that 24.1% of the survey respondents were confused as to the source of products sold by Steak 'Em-Up because of the similarity of the names Steak Umm and Steak 'Em-Up.

Mr. Klein also conducted a second analysis of the data and examined the difference between the answers given by respondents to Questions 1 and 4.  In this analysis, 31% of survey respondents in the test group indicated their belief that Steak 'Em-Up either serves or uses Steak Umm products or that Steak 'Em-Up is connected or affiliated with the company that sells Steak Umm sliced steaks and burgers.  To account for guessing and other variables, Mr. Klein conducted the survey with a separate group of respondents who were shown "The Steak Out" (as a control name) instead of "Steak 'Em Up."  For "The Steak Out" name, the analysis showed that 18.1% of survey respondents in the control group indicated their belief that The Steak Out either serves or uses Steak Umm products or that The Steak Out is connected or affiliated with the company that

sells Steak Umm sliced steaks and burgers.  Upon subtracting perceptions created by this control stimulus, Mr. Klein found that the net confusion measured was 12.9% (31.0% - 18.1%).

In response to this survey, Steak 'Em-Up retained Dr. Michael Rappeport to review and critique Mr. Klein's analysis and report.  Dr. Rappeport commented and critiqued the analysis and the Klein report.  He did not design his own survey.  Dr. Rappeport testified that there were issues with how Mr. Klein designed, conducted, and analyzed his survey, including, the use of the "why" question, the Q1/Q4 skip pattern, the control restaurant name selection, and the wording of the questions asking about the product vs. the brand.

Dr. Rappeport critiqued the use of the "why" question.  Dr. Rappeport opined that the respondents who answered the "why" question were merely guessing because the only information the respondents had about the defendant was that it was a restaurant named "STEAK 'EM-UP." Dr. Rappeport testified that he thought the respondents who answered "yes" to Question 1 should also have been asked Question 4 because some of the respondents who answered "yes" to Question 1 that Steak 'Em-Up serves Steak Umm products might answer "no" to Question 4 that they are related or affiliated.  Dr. Rappeport criticized the use of the control restaurant name "The Steak Out" because it did not sound similar to "Steak 'Em-Up" and he thought a name like "Steak 'n Shake" or "Steak 'n Bake" would have been a better control.  Dr. Rappeport also was concerned with the wording of Question 1 because he believed the respondents might interpret the

phrase "the products you saw earlier" to refer to generic steak products, as opposed to the Steak Umm products that the respondents saw in preceding questions.

**B.    Analysis**

"In borderline cases where evidence of actual confusion is not available or is not overwhelming, the gap should be filled by a properly conducted survey of the relevant class of prospective customers of the goods or services at issue." Urban Outfitters, Inc. v. BCBG Max Azria Group, Inc., 511 F. Supp. 2d 482, 498 (E.D. Pa. 2007) (Baylson, J. presiding) (citing McCarthy § 23:17). "In some cases, such such survey evidence can serve to demonstrate evidence of actual confusion, but only to the extent that the survey replicates the real world setting in which instances of actual confusion would occur." Urban Outfitters, Inc. v. BCBG Max Azria Group, Inc., 511 F. Supp. 2d 482, 498 (E.D. Pa. 2007).

Steak Umm's survey of consumers is also not evidence of actual confusion because Mr. Klein's survey contains numerous flaws. When combined, these fundamental methodological flaws undermine the Klein opinion and I find that the survey does not establish a likelihood of confusion. Survey percentages demonstrating confusion levels over 50% are always viewed by courts as persuasive evidence of likely confusion.[9] Generally, figures in the range of 25% to 50% have been viewed as support for a finding of a likelihood of confusion.[10] When the "percentage of confusion" survey

---

[9] See e.g., Sears, Roebuck & Co. v. Johnson, 219 F.2d 590 (3d Cir. 1955) (74 percent).

[10] See e.g., McDonald's Corp. v. McBagel's, Inc., 649 F. Supp. 1268 (S.D. N.Y. 1986) (25% supports finding of likely confusion); Berkshire Fashions, Inc. v. Sara Lee Corp., 729 F. Supp. 21 (S.D. N.Y. 1990) (a result of 28% supports a finding of a likelihood of confusion); Gross v. Bare Escentuals Beauty, Inc., 641 F. Supp. 2d 175, 191

result dips below 10%, it can become evidence that indicates there is no likelihood of confusion.[11]   When the survey evidence of likelihood of confusion yields a result between 11% and 25%, the decision often depends on other issues in the case.

Here, Steak Umm's survey evidence shows that 24.1% using one analysis, or 12.9% using a separate analysis, of consumers are likely to be confused as to whether Steak 'Em-Up uses Steak Umm products, because of the similarity in their names, or that

---

(S.D. N.Y. 2008) ("The consumer survey evidence indicates that there is a 34.5% confusion rate, or using plaintiffs' approach, a 47% confusion rate. This substantial rate of confusion, coupled with the numerous anecdotal accounts of confusion, indicate that there was actual consumer confusion. This factor is sufficient to establish that there is a likelihood of confusion." Infringement was found.); John Walker & Sons, Ltd. v. Bethea, 305 F. Supp. 1302, 1305, n.2 (D.S.C. 1969) (22-60% of respondents: "[T]he surveys proved that when shown to a substantial number of people, defendant's [motel] sign brought to mind plaintiff's product, whiskey."); Bell v. Starbucks U.S. Brands Corp., 389 F. Supp. 2d 766 (S.D. Tex. 2005), judgment aff'd, 205 Fed. Appx. 289 (5th Cir. 2006) (25% is sufficient to show a "significant" level of "actual confusion" and to support a finding of infringement.); Seven-Up Co. v. Green Mill Beverage Co., 191 F. Supp. 32, 35 (N.D. Ill. 1961) (25% is "credible evidence" of likely confusion.); Helene Curtis Industries, Inc. v. Church & Dwight Co., Inc., 560 F.2d 1325 (7th Cir. 1977) (29% (290 of 998) relied upon to affirm preliminary injunction.); Piper Aircraft Corp. v. Wag-Aero, Inc., 741 F.2d 925 (7th Cir. 1984) (45% results are "high" and a factor "weighing strongly" in support of a likelihood of confusion.); A.T. Cross Co. v. TPM Distributing, Inc., 1985 WL 72660 (D. Minn. 1985) (43% and 34% results are entitled to "great weight" and prove "actual confusion" as well as "strong likelihood of confusion."); Gateway, Inc. v. Companion Products, Inc., 384 F.3d 503, 510, (8th Cir. 2004) (39% confusion rate on survey exceeds the rate the court had in a prior case found to be sufficient.); Thane Intern., Inc. v. Trek Bicycle Corp., 305 F.3d 894, 903 (9th Cir. 2002) ("[W]e must conclude that the survey provides evidence from which a reasonable jury could conclude that more than one quarter of those who encounter both Trek and OrbiTrek ads will be confused about the origin of the OrbiTrek exercise machine."); Standard Oil Co. v. Standard Oil Co., 252 F.2d 65, 74 (10th Cir. 1958) (40% supports finding of likely confusion: out of 1,589 persons interviewed, 634 thought that the accused mark Sohio meant "Standard Oil" of Ohio.); J & J Snack Foods Corp. v. McDonald's Corp., 932 F.2d 1460 (Fed. Cir. 1991) (A result of 30% confused respondents supports a finding of likely confusion.).

[11] Wuv's International, Inc. v. Love's Enterprises, Inc., 1980 WL 30296 (D. Colo. 1980) (9% results; no likelihood of confusion proven); Levi Strauss & Co. v. Blue Bell, Inc., 778 F.2d 1352 (9th Cir. 1985) (results of less than 2% held to support the conclusion of no likelihood of confusion); G. Heileman Brewing Co. v. Anheuser-Busch, Inc., 676 F. Supp. 1436 (E.D. Wis. 1987), aff'd, 873 F.2d 985 (7th Cir. 1989) (survey result of 4.5% "falls well within the range which other courts have determined weighs against a finding of infringement"); IDV North America Inc. v. S & M Brands, Inc., 26 F. Supp. 2d 815, 831 (E.D. Va. 1998) (Survey result of 2.4% proves "the absence, rather than the presence, of likely confusion of source or sponsorship between Bailey's cigarettes and BAILEY's liqueurs); Paco Sport, Ltd. v. Paco Rabanne Parfums, 86 F. Supp. 2d 305 (S.D.N.Y. 2000), judgment aff'd, 234 F.3d 1262 (2d Cir. 2000) (confusion level of 5% held "virtually indistinguishable" from the control group. No likelihood of confusion found.); Brockmeyer v. Hearst Corp., 248 F. Supp. 2d 281, 298 (S.D. N.Y. 2003) (3% confusion results is proof that there will be no likelihood of confusion); CareFirst of Maryland, Inc. v. First Care, P.C., 434 F.3d 263 (4th Cir. 2006) (No confusion likely between senior CAREFIRST and junior FIRST CARE for physicians group medical office. Survey showing only 2% level of confusion among 130 persons surveyed is de minimis and is "hardly a sufficient showing of actual confusion."); Newport Pacific Corp. v. Moe's Southwest Grill, LLC, 2006 WL 2811905 (D. Or. 2006) (14% confusion result is "barely above McCarthy's threshold that confusion results below 10% are evidence that confusion is not likely.").

consumers are confused as to whether there is a relationship or affiliation between Steak 'Em-Up and Steak Umm because of the similarity in their names. These percentages fall in a range between 10% and 25% where Courts have found a likelihood of confusion in some instances, and no likelihood of confusion in other cases. Steak 'Em-Up's expert, Dr. Rappeport, opined that Mr. Klein's expert report was flawed and the lower bound (12.9%) was an overestimate. In his expert opinion, he believed that a figure of no more than 10% is a fair estimate for Klein's results.

Surveys are only evidence of actual confusion if they replicate the real world setting in which a consumer would encounter the mark. See Perlman, "The Restatement of the Law of Unfair Competition: A Work in Progress," 80 Trademark Rep. 461, 472 (1990). The first issue with Steak Umm's survey is that it was conducted online and using only the name of Steak 'Em-Up. It did not incorporate Steak 'Em-Up's logo or the packaging that accompanies its take-out products, menus, and street sign. This is not how a consumer would encounter the party's products in a real world setting and this set-up undermines the effectiveness of the survey. The block text is divergent from the conditions in which a consumer would encounter "Steak 'Em-Up" in commerce. To order an item from "Steak 'Em-Up," a consumer will inevitably have had to look at the menu. In order to shop at Steak 'Em-Up for convenience items, a consumer would view the signs of the logo and name at the store location. Perhaps, a more effectively designed survey could include screen shots of the parties' websites, product packaging or even the styled text from each company's logos.

Upon analyzing the survey results and the reasons noted by the respondents, Mr. Klein found that 24.1% of the survey respondents were confused as to the source of products sold by Steak 'Em-Up because of the similarity of the names Steak Umm and Steak 'Em-Up.  However, the first analysis and Mr. Klein's methodology regarding the control question ("Why do you say that?) is flawed.  Question 2 is not a valid control to account for guessing.  At the time the respondent was asked Question 2, the only stimulus he or she had to derive the right answer was the name "Steak 'Em-Up."  When the respondent answers "the names" (or some variation suggesting that he or she based his or her answer on the similarity in names), it does not show whether the respondent was simply guessing.  Rather, the significance of a respondent giving a reason connected with the actual stimulus is a *non sequitur* because the respondent had no other criteria on which to base his or her response.  The only stimulus available to the respondents was the name of the restaurants.  To give a reason akin to "I gave you my answer because of the names" is not a control, it's a mere explanation of how they saw the stimuli and does not indicate how the Respondents would see the stimuli in the real world versus the survey world.  Thus, I will accord the result of 24.1% yielded from Mr. Klein's first analysis no weight because it lacked a valid control under the accepted methods of taking trademark surveys.   Additionally, I find that the use of the block text did not replicate real-world settings in which a consumer would encounter "Steak 'Em-Up" in commerce.

Regarding the second analysis that yielded a 12.9% confusion rate, there are three major errors in addition to the use of the block text.  First, Mr. Klein used "The Steak Out" as the control stimulus and then subtracted the results for the combination of Q1 and

Q4 for "The Steak Out" from the results of the same question combination for "Steak 'Em-Up."  However, "The Steak Out" was not the best control stimulus in this case.  I agree with Dr. Rappeport that "Steak 'n Shake" or "Steak 'n Bake" are better control stimuli because they sound and look more similar.  Besides the word Steak, "The Steak Out" has little in common with either Steak 'Em-Up or Steak Umm.  The fact that "Steak 'n Shake" is an existing restaurant is irrelevant because the existence of the restaurant will have minimal, if any, effect on whether consumers believed there was some connection between Steak 'n Shake and Steak Umm.  "Steak 'n Shake" or "Steak 'n Bake" could have been used instead of "Philly Steak and Gyro" and "Larry's Steaks" to allow for multiple controls in the study in addition to "The Steak Out."  Had the survey incorporated better controls, it may have led to a reliable conclusion.

Additionally, the second analysis also erroneously allows for a biasing skip pattern between Question 1 and Question 4.  Mr. Klein's survey first asks, in Q1, "Do you believe this restaurant does serve or use the products you saw earlier, or do you believe this restaurant does not serve or use the products you saw earlier?"  He then asks, Q4, "Do you believe that this restaurant is connected or affiliated with a company that puts out the products you saw earlier, or do you believe this restaurant is not connected or affiliated with a company that puts out the products you saw earlier?"  However, he only asks Q4 to the Respondents who answer "No" or "I don't know" to Q1.  There is no reason to assume that every person who answers Yes to Q1, (thinks that Steak 'Em-Up serves Steak Umm products) will also think that the two companies are affiliated or connected.  Because Mr. Klein never asks the second question, there is no way to know

whether any people believe that Steak 'Em-Up may purchase Steak Umm products to serve or use, but do not think the companies are related or affiliated.  The flaw in this questioning allows Mr. Klein to have "two bites at the apple" to yield favorable results for his client.  Dr. Rappeport correctly notes that if we simply assume no person was asked Question 4, this would reduce the total number of "confused" in the test group to 88 (29%) and the total number confused in the control group to 52 (17.2%), for a net test of 11.8% (29.0% - 17.2%).

Even if I accepted 11.8% as a more accurate value, the final problem with Mr. Klein's survey becomes that he did not estimate the likelihood of confusion in the traditional sense, rather, he estimated whether consumers were likely to believe that Steak 'Em-Up *serves* or *uses* Steak Umm products.  The results of a survey asking respondents whether a restaurant named "Steak 'Em-Up" serves "Steak Umm" products (sandwiches and burgers) is almost meaningless.  Relevant survey questions concern confusion of source or sponsorship in a source confusion case, not questions focusing on product confusion.  See Sunbeam Corp. v. Equity Indus. Corp., 635 F. Supp 625, 635 (E.D. Va. 1986); Jordache Enters., Inc. v. Hogg Wyld Ltd., 625 F. Supp. 48, 54 (D.N.M. 1985) ("whether a consumer may perceive the products themselves as similar is little help in determining whether there is a likelihood of confusion as to source of origin of the products"), aff'd, 828 F.2d 1482 (10th Cir. 1987).  The survey is fundamentally flawed because it was designed to gather data irrelevant to measuring trademark source confusion.  The Klein survey was designed to measure whether consumers believe Steak 'Em-Up *uses or sells* Steak Umm products in Question 1.  Whether a steak shop

purchases and uses or sells Steak Umm products does not necessarily demonstrate source confusion.  A hypothetical consumer may believe that Steak 'Em-Up is simply a vendor or seller of Steak Umm's frozen steaks and hamburgers but that there is no affiliation, no agency, no connection, and no relationship between the two.  Because Mr. Klein failed to ask the connection/affiliation question to all consumers, his survey fails to show source confusion.

Accordingly, numerous fundamental flaws in Mr. Klein's survey undermine the reliability of his numbers.  Dr. Rappeport estimates that no more than a 10% likelihood of confusion is a fair estimate for Mr. Klein's results.  Dr. Rappeport's estimate is based solely on his expertise.  I find and conclude that there is no evidence of likelihood of confusion due to the multiple flaws in the Klein survey and Dr. Rappeport's critique of the Klein survey.  Having no evidence demonstrating a reliable percentage of a likelihood of confusion, this Court gives no weight to the survey results.[12]

---

[12] I declined to accept the Plaintiff's expert's conclusion that the likelihood of confusion between the parties' marks was either 12.9% or 24.1% after finding several methodological flaws with the surveys.  Even if Mr. Klein's expert opinion did not contain numerous fundamental flaws and I accepted his conclusion that 12.9% or 24.1% of consumers are likely to be confused, the overwhelming evidence in favor of Steak 'Em-Up under the other Lapp factors would nonetheless lead me to conclude that there is no likelihood of confusion and the Defendant would still prevail.  The Defendant also argues that the Plaintiff committed three separate acts of fraud on the United States Patent and Trademark Office when it renewed U.S. Trademark Registration No. 1116446 for rolls and No. 2375933 (frozen food sandwich kits) used in connection with its goods and services.  At his deposition, Mr. Szortyka testified that Steak Umm had not sold rolls at the time that he made his sworn statement to the USPTO.  However, Mr. Szortyka clarified this point at trial and explained that at the time of his deposition, he forgot that one of his three products he was selling contained rolls in the box.  I conclude that Mr. Szortyka, by or though his counsel Mr. Goldstein, did not make intentional false statements in the renewal of its applications.  Section 35(a) of the Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."  15 U.S.C. § 1117(a)(3).  Defendant asks for an award of attorney's fees in this case because of the Plaintiff's alleged culpable conduct when pursuing its claims.  I find that the Plaintiff did not engage in culpable conduct.  The Plaintiff's claim was not unjustified, groundless, or frivolous and the plaintiff's subjective conduct throughout the litigation was not vexatious, as required to impose an award of fees.  The Plaintiff survived a motion for summary judgment, and prevailed on one of the Lapp factors at trial.  Although the Plaintiff did not come close to meeting its burden at trial, and the factual findings of this Court under nine of the ten Lapp factors supports a judgment in favor of the Defendant, I do not find that this is an exceptional case justifying an award of attorney's fees.

**IV.     CONCLUSION**

For the foregoing reasons, the Court concludes that the Defendant did not infringe on Plaintiff's mark.  Nor is the Defendant liable for any of the other claims alleged.  The Plaintiff failed to establish grounds for injunctive relief.  The Defendant did not successfully establish an unclean hands defense and this case is not an exceptional case that justifies an award of attorney's fees in favor of the Defendant.  Judgment will be entered in favor of the Defendant, Steak 'Em Up, Inc., and against the Plaintiff, The Steak Umm Company, LLC.

An appropriate Order follows.